FILED
JAMES J. WALDRON
JUL 0 1 2010
U.S. BANKRUPTCY COURT
NEWARK, NJ
BY_____ DEPUTY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

In re                        :
                             :
MARTIN CADILLAC, LLC,        :     BANKRUPTCY NO. 10-29520 (RG)
                             :
    Debtor.                  :     CHAPTER 11
                             :

## LIMITED OBJECTION OF GENERAL MOTORS LLC TO THE DEBTOR'S EMERGENT MOTION

### I. INTRODUCTION

General Motors LLC ("GM") hereby objects to the Debtor's Emergent Motion for Emergent Order Authorizing, Pending Hearing on the Debtor's First Day Motions, the Immediate Use of Cash Collateral and Granting Other Limited Relief Relating Thereto ("Motion"). By its Motion, debtor Martin Cadillac, LLC ("Debtor" or "Martin Cadillac") seeks access to its cash collateral to fund its post-petition ordinary course obligations. Motion at 6. Debtor argues that it needs this access in order to pursue an orderly sale, as permitted by applicable law, of its interest in a Cadillac dealership ("Dealership") and the Dealership's assets.

GM is Debtor's counterparty to several agreements that are critical to Debtor's continued operations. GM does not agree with Debtor's characterization of these agreements or assertions regarding the scope or nature of its rights pursuant to these agreements. The question of Debtor's rights in these agreements is not before the Court on this Motion, and GM objects to the Motion to the extent it purports to address those rights outside the context of a motion under sections 362, 363, or 365 of the Bankruptcy Code. GM reserves all rights and objections pursuant to these agreements and under applicable law.

GM also reserves its rights in connection with all financial transactions between it and the Debtor arising out of or related to the Dealer Agreement, including but not limited to transactions involving Debtor's so called open account and amounts owing pursuant to the Settlement

A/73421515.2

Agreement, as described below. Accordingly, GM has informed the Debtor that any open account credits are being held by GM pursuant to an administrative freeze. These monies will be held pending GM's evaluation as to its set off and recoupment rights vis-à-vis the Debtor and any interested parties, and GM's determination regarding how those rights may apply here. In particular, GM needs an opportunity to investigate the Debtor's accounts, finances, incentives, and related matters.

Further, GM notes that the Debtor is obligated to continue customary sales and service operations and otherwise comply with all material obligations under the Dealer Agreement and related agreements with GM and that a failure to do so would constitute a non-curable event of default under the Debtor's Dealer Agreement, which would preclude a sale of the Debtor's interest in the Dealership. As part of its continued operations, Debtor is required to have adequate floor plan financing, which the Motion suggests the Debtor does not have. While GM takes no position on whether the Court should or should not authorize the continued use of cash collateral, and might be prepared to make accommodations in support of an acceptable sale transaction should one materialize, GM reserves all of its rights pursuant to the agreements described herein and under applicable law.

In support of its objection, GM states as follows:

## II. RELEVANT FACTUAL BACKGROUND

1. The Debtor operates a new and used car retail business at 374 Route 9W in Englewood Cliffs, New Jersey. The Debtor is an authorized dealer for Cadillac vehicles pursuant to a Dealer Sales and Service Agreement between Debtor and GM ("Dealer Agreement"). Affidavit of Lawrence S. Buonomo ("Buonomo Aff."), ¶ 3. The Dealer Agreement incorporates certain Standard Provisions. *See* Buonomo Aff., ¶ 2, Ex. A ("Dealer Agreement Standard Provisions").

2. The Debtor leases the dealership premises from Nacht Cadillac, Inc., an affiliate of GM, pursuant to a Master Lease dated June 6, 2003 ("Lease").

3. Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on June 25, 2010.

4. Before the petition date, GM and Martin Cadillac mutually agreed to terminate the Dealer Agreement. This agreement to terminate was the result of a mediation involving GM, Martin Cadillac, and Martin Cadillac of Yonkers LLC ("Martin Yonkers"), an affiliate of Martin Cadillac that previously operated a separate Cadillac dealership in Yonkers, New York. The mediation was held on May 14, 2010, and addressed (i) a pending involuntary termination of the Dealer Agreement effective no later than June 25, 2010, as set forth in GM's letter of termination to Martin Cadillac, dated April 23, 2010, and (ii) sums charged back to Martin Cadillac and Martin Yonkers in light of sales incentive audits conducted by GM at each dealership in early 2010. Buonomo Aff., ¶ 4. The parties executed a Settlement Term Sheet on May 22, 2010 ("Settlement Agreement"), which contains the terms and conditions of the parties' resolution of the issues raised in the mediation. Buonomo Aff., ¶ 5, Ex. B, Settlement Agreement.

5. Pursuant to the Settlement Agreement, Martin Cadillac agreed that the matters set forth in the pending termination letter constituted valid and sufficient grounds for termination under applicable law. However, Martin Cadillac and GM agreed to modify the termination letter so that the Dealer Agreement will be terminated by mutual agreement on October 25, 2010, in part to allow Martin Cadillac to pursue the sale of all of its assets to a replacement dealer acceptable to GM. The Settlement Agreement provides that if Martin Cadillac has submitted a proposed sale to GM by October 25, 2010, but GM has not approved or disapproved the proposed sale as of that date, then the termination date of the Dealer Agreement will be extended to December 10, 2010. Buonomo Aff., Ex. B.

6. In the Settlement Agreement, Martin Cadillac agreed that as long as the Dealer Agreement remained in effect, Martin Cadillac "shall continue to make monthly payments to reduce monies due to GM for audit chargebacks related to the 2009 audit at the Englewood Cliffs, N.J. facility through the open account at the previously agreed-upon amount of $22,920 per month." Settlement Agreement, ¶ 7. Martin Cadillac is required to make these payments

whether or not it sells its dealership assets to a replacement dealer. Settlement Agreement, ¶¶ 10, 11. If Martin Cadillac is able to sell its dealership assets, it agreed to pay GM $750,000 in "satisfaction of all sums due by reason of completed audits of Martin Cadillac," except for the above-described required monthly payments. Settlement Agreement, ¶ 10.

7.  Martin Cadillac and GM agreed that, except as otherwise provided by the Settlement Agreement, "the relationship between GM and Martin Cadillac shall continue to be governed by the terms of the Dealer Agreement." Settlement Agreement, ¶ 12.

### III. ARGUMENT

#### A. GM is a Party In Interest

8.  GM is a party in interest with respect to the Debtor's Motion because, among other reasons, the Debtor has listed GM as a creditor. *See* Voluntary Petition at 5.

9.  In addition, GM is a party in interest because the Debtor's Motion relates to Debtor's stated goal of pursuing a sale of its interest in the Dealership. The Debtor only may seek to sell its dealership assets pursuant to the terms of the Dealer Agreement. *See, e.g.*, Buonomo Aff., Ex. A, Dealer Agreement, Standard Provisions, ¶12.2. In fact, the express terms of the Dealer Agreement bar the Debtor from selling its assets without GM's approval.[1] *See, e.g.*, Dealer Agreement, Standard Provisions, ¶¶ 12.2; 13.1.2 (any attempt to sell or assign the dealership agreement results in a breach of contract); and 17.8 ("Except as provided in Article

---

[1] By its express terms, the Dealer Agreement is not a salable or assignable contract. Rather, the agreement simply gives a dealer the right to sell the dealership assets conditioned upon a proposed buyer being approved as an authorized GM dealer. For example, Article 17.8 provides "[d]ealer has not paid any fee for this Agreement. Neither this Agreement nor any right granted by this Agreement is a property right. Except as provided in Article 12, neither this Agreement nor the rights or obligations of Dealer may be sold, assigned, delegated, encumbered or otherwise transferred." Article 12.2. in turn provides "[i]f Dealer proposes a change in Dealer Operator, a change in ownership, or a transfer of the dealership business or its principal assets to any person conditioned upon General Motors entering into a Dealer Agreement with that person, General Motors will consider Dealer's proposal and not unreasonably refuse to approve it..." Thus, the express terms of the Dealer Agreement make clear that the parties contemplated that the agreement is not a separate salable asset.

-4-

A/73421515.2

12, neither this Agreement nor the rights or obligations of Dealer may be sold, assigned, delegated, encumbered or otherwise transferred.").

### B. The Debtor's Rights Regarding Agreements with GM Are Not Addressed by the Motion

10. GM is the Debtor's counterparty to several critical agreements, including the Dealer Agreement and Settlement Agreement. In addition, GM's affiliate is Debtor's landlord, although as of June 30, 2010 the Lease has expired and Debtor is a holdover tenant. These relationships are crucial to Debtor's continued operations as an authorized Cadillac dealer, and to its stated goal in filing for bankruptcy protection: pursuing a sale of its interest in the Dealership. *See* Motion at 5-6. Without maintaining the Dealer Agreement and tenancy in an acceptable dealership facility, the Debtor may not seek to sell its dealership assets pursuant to Sections 363, 365 or otherwise.

11. GM does not agree with any purported characterization of these agreements in the Motion, or any assertions as to the scope or nature of the Debtor's rights pursuant to these agreements. To the extent necessary, these issues must be addressed in connection with a motion filed under sections 362, 363, and 365 of the Bankruptcy Code. They should not be addressed in the context of this Motion. Accordingly, GM reserves all rights and objections regarding these agreements, and objects to the Motion to the extent the Debtor attempts to assert its alleged rights pursuant to these agreements.

### C. The Debtor Is Obligated To Continue Customary Sales and Service Operations

12. The Debtor is obligated to continue customary sales and service operations and otherwise remain in compliance with all of its material obligations under the Dealer Agreement and related agreements, and a failure to do so would constitute a non-curable event of default which would preclude a sale of the Debtor's interests in the Dealership since the Debtor only may seek to sell its dealership assets pursuant to the terms of the Dealer Agreement.

A/73421515.2

13. The failure of Debtor to conduct customary sales and service operations during customary business hours for seven consecutive business days is grounds for termination under the Dealer Agreement. Dealer Agreement Standard Provisions, ¶ 14.5.3.

14. In addition, the Settlement Agreement provides that the Dealer Agreement will terminate automatically without further action on October 25, 2010, if Debtor has not proposed a buyer. Thus, it is particularly important that the Debtor maintain operations and otherwise meet its obligations under the Dealer Agreement in order to be able to sell its dealership assets pursuant to the Dealer Agreement.

15. Further, it is well established that an automobile dealer's breach of its dealership agreement by failing to conduct required operations for a period of time constitutes a "historical fact" that cannot subsequently be cured. *See Worthington v. GMC (In re Claremont Acquisition Corp.)*, 113 F.3d 1029, 1033 (9th Cir. 1997) ("Debtors' failure to operate the dealership for two weeks preceding the bankruptcy filing constituted a nonmonetary default. Moreover, this default is a 'historical fact' and, by definition, cannot be cured."); *In re Lee West Enterprises, Inc.*, 179 B.R. 204, 209 (Bankr. C.D. Cal. 1995) (finding failure of debtor automobile dealer to operate for approximately three months constituted "incurable default" of debtor's dealership agreement, where agreement provided for termination based on closure for six consecutive days and California Vehicle Code provided that closure for seven consecutive days could be grounds for termination); *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 476 (Bankr. S.D.N.Y. 1992) (noting that automobile dealer's failure to remain operational for seven days would constitute a default "incapable of cure or remedy because the debtor cannot undo this historical fact"). The lapse in operations has been viewed to interrupt "a key goodwill value" to the franchisor which the debtor's estate cannot "undo" after the fact. *In re Deppe*, 110 B.R. 898, 904 (Bankr. D. Minn. 1990) (19-day interruption "is a default which is incapable of cure or remedy").

A/73421515.2

### D. The Operating Budget Fails to Account for the Settlement Agreement

16.  The Debtor's proposed operating budget ("Budget") fails to account for the Settlement Agreement. *See* Declaration of Timothy F. Martin in support of the Motion, Exhibit B. The Budget does not include the required payments of $22,920 per month that Debtor must make through the open account to reduce monies due to GM for audit chargebacks, as per the Settlement Agreement. Settlement Agreement, ¶ 7. If the Debtor does not make these payments, it will lose the benefits of the Settlement Agreement, including the extension of the termination date for the Dealer Agreement until October 25, 2010.

17.  It is particularly important that the Debtor comply with the terms of the Settlement Agreement both in order to continue to operate and in order to sell its Dealership assets pursuant to the Dealer Agreement. Without the Settlement Agreement, the Dealer Agreement would have terminated no later than June 25, 2010. Debtor has acknowledged that GM had valid and sufficient grounds to terminate the Dealer Agreement pursuant to GM's letter of April 23, 2010, and there also may be additional grounds for termination that have arisen since GM's original termination letter. Once the Dealer Agreement is terminated, Debtor will be precluded from seeking to sell its interest in the Dealership, which sale only may be accomplished pursuant to the Dealer Agreement.

18.  Even if the Debtor complies with the Settlement Agreement, the Budget contemplates the Debtor continuing to sell vehicles after the Dealer Agreement will be terminated. Pursuant to the Settlement Agreement, however, the Debtor's Dealer Agreement will terminate on October 25, 2010, or even sooner if Debtor requests an earlier termination date to facilitate the sale of the dealership assets. Settlement Agreement, ¶ 2. Upon termination of the Dealer Agreement, the Debtor will no longer be authorized to sell new Cadillac vehicles. Nonetheless, the Budget estimates sales through December 30, 2010. *See* Declaration of Timothy F. Martin in support of the Motion, Exhibit B. By including estimated sale proceeds through December 30, 2010, the Debtor's Budget fails to account for Debtor's agreement that the Dealer Agreement will terminate at some point before that date.

A/73421515.2

### E. The Debtor Must Have Floor Plan Financing to Continue Operations

19. While GM does not object to the Debtor's attempts to sell present vehicle inventory or to obtain new inventory, GM notes that extending the use of cash collateral will not necessarily result in the Debtor being able to purchase new vehicles from GM.

20. The Debtor has approximately 82 new and 5 used vehicles in its inventory pursuant to floor plan financing from General Motors Acceptance Corporation ("GMAC"). Debtor has not obtained GMAC's consent to sell these vehicles. *See* Motion at 8.

21. The Debtor does not have financing to purchase additional vehicles. *See* Motion at 8 ("Debtor does not have a commitment from its existing floor plan lender, GMAC, to provide post-petition floor plan financing for new Cadillac vehicles purchased after the Petition Date."). The Debtor is attempting to obtain debtor-in-possession floor plan financing, but has not submitted an application to the Court seeking authorization for this financing. Motion at 8.

22. Pursuant to the Dealer Agreement, the Debtor is required to maintain a floorplan line of credit with a creditworthy financial institution. Dealer Agreement Standard Provisions, § 10.2, Buonomo Aff., ¶ 6, Ex. A.

23. Because the Debtor does not have floor plan financing, allowing the continued use of cash collateral will not necessarily result in the Debtor being able to purchase new vehicles from GM. It is not GM's practice to accept or otherwise incur credit risk when accepting orders or selling vehicles to dealers. Instead, GM relies on the required floor plan financing when selling vehicles to dealers. Buonomo Aff., ¶ 6.

24. Debtor's Budget anticipates Debtor selling approximately 347 new vehicles and 187 used vehicles between July 1 and December 30, 2010. *See* Declaration of Timothy F. Martin in support of the Motion, Exhibit B. Debtor will not be able to approach these sales levels without additional inventory, which it will not be able to obtain without floor plan financing.

### F. GM Reserves All Rights

25. While GM takes no position on whether the Court should or should not authorize the continued use of cash collateral, GM reserves all of its rights pursuant to the agreements described herein and under applicable law.

### IV. CONCLUSION

GM does not agree with Debtor's characterization of agreements to which GM or its affiliates is a party, or the Debtor's assertions regarding the scope or nature of its rights pursuant to these agreements. GM objects to the Motion to the extent it purports to address those rights outside the context of a motion under sections 362, 363, or 365 of the Bankruptcy Code. GM reserves all rights and objections pursuant to these agreements and under applicable law. GM also reserves its recoupment rights and all other rights in connection with financial transactions between it and the Debtor arising out of or related to the Dealer Agreement, including but not limited to transactions involving Debtor's open account and amounts owing pursuant to the Settlement Agreement. Further, GM notes that the Debtor must continue customary sales and service operations, and otherwise comply with its obligations under the Dealer Agreement, and that a failure to do so would constitute a non-curable event of default under the Debtor's Dealership Agreement, which would preclude a sale of the Debtor's interest in the Dealership. As part of its continued operations, Debtor must have floor plan financing, which it currently does not have. Debtor also must comply with its obligations under the Settlement Agreement in order to avoid termination of the Dealer Agreement before the agreed-upon date. GM further objects to the Motion to the extent it fails to account for (i) the Debtor's inability to sell new Cadillac vehicles after the termination of the Dealer Agreement pursuant to the Settlement Agreement, and (ii) amounts the Debtor owes to GM pursuant to the Settlement Agreement.

A/73421515.2

Respectfully submitted,

**GENERAL MOTORS LLC,**

By its attorneys,

DATED: June 30, 2010      By:      /s/ John R. Skelton
John R. Skelton (*pro hac vice admission pending*)
Evan J. Benanti (*pro hac vice admission pending*)
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA 02110
(617) 951-8000

A/73421515.2